# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KAREN L. HOPPER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 13-CV-567-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Karen L. Hopper ("Hopper"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Hopper's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Hopper appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Hopper was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Hopper was 51 years old at the time of the hearing before the ALJ on December 19, 2011. (R. 35). She had obtained a GED and an associate's degree in business and computer technology. (R. 35-36).

Hopper testified that she had not worked since she was hospitalized for six days in July 2009 on a suicide watch. (R. 38-39). She was diagnosed with bipolar disorder. (R. 39). She said that she had days of deep depression and other days when she was "hyper." (R. 43). She said that she experienced an episode of deep depression about every six months. (R. 43-44). During those episodes, she would cry "non-stop." (R. 48). She could then have an episode of being hyper that would last for a month followed by a period of being "on an even keel." (R. 44). She had episodes every few months when she became extremely irritable and "almost violent." (R. 43-45). When these episodes occurred, Hopper felt trapped, and she would lash out at people verbally to escape. (R. 45).

Hopper said that her medications were helpful, but her doctors were still adjusting them to find the best ones. *Id.* Her medications sometimes made her have nausea and vomiting. (R. 45-46). She described herself as "always kind of groggy." *Id.* She avoided driving due to her grogginess, so she only drove about once every other week. (R. 46).

Hopper said that she only left the house when she had no choice, and most of those times were for a doctor's appointment. (R. 46-47). She tried to clean her house, but it seemed to be an overwhelming task, so she would end up not doing it. (R. 47). She only bathed when she was leaving the house, because it took "too much energy." *Id.* She had showered for the hearing, but she had not showered for two weeks before that. *Id.* She described herself as "in an even period" at the time of the hearing, but she was still tired all of the time. *Id.*

Hopper said that she had trouble with memory and with focus. (R. 48). She said that she could not read, because she could not remember what she had read, and she would lose interest. *Id.* She said that her hospitalization in 2009 had happened when she was stressed about many

things. (R. 48-49). She testified, however, that even if she was given a low-stress job, she would not be able to do it due to memory issues and an inability to focus. (R. 49).

Hopper said that she also had physical problems with her back that caused problems with lifting, walking, and bending. (R. 49). She testified that she had surgery in 2006. (R. 50). She said that she had been prescribed Mobic and Flexeril for her back pain, but they did not help. *Id.*

Records reflect that Hopper had surgery on levels L4/L5 and L5/S1 of her lumbar spine at Hillcrest Medical Center on November 8, 2006. (R. 345-49, 351-59). A letter from her surgeon dated February 1, 2007 stated that she had healed well, her pain had completely resolved, and she was released to return to normal activity and to work. (R. 351).

Records from J. Steve Grigsby, D.O., reflect that Hopper was treated with prescription medications for osteoarthritis, depression, and anxiety in 2007 and 2008. (R. 337-41).

Hopper was seen at Craig General Hospital for physical therapy due to cervical strain in November and December 2008. (R. 232-41).

Hopper presented to the emergency room at Craig General Hospital on July 9, 2009 with suicidal thoughts. (R. 242-52). She was transferred to Wagoner Community Hospital and treated on an in-patient basis until discharge on July 13, 2009. (R. 254-62). On discharge, Hopper's Axis I[1] diagnosis was bipolar II disorder and her Global Assessment of Functioning

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

("GAF")[2] was scored as 45. (R. 254-55). She was prescribed Prozac, Xanax, Abilify, and Remeron, and she was instructed to follow up at Laureate. (R. 254).

Hopper was seen as a new patient at Laureate Psychiatric Clinic and Hospital ("Laureate") on August 10, 2009. (R. 283-85). Hopper reported a long history of depression, anxiety, and mood swings. (R. 283). Her mood and affect were sad and anxious. (R. 284). Her primary diagnosis on Axis I was bipolar II disorder, with other diagnoses of panic disorder with agoraphobia; social anxiety disorder; and nicotine dependence. *Id.* Her current GAF was scored as 55-60, with a highest in the past year of 70. (R. 285). Her medications were adjusted. *Id.*

Hopper returned to Laureate on August 28, 2009, and she had continued symptoms of difficulty sleeping, panic attacks, feelings of hopelessness, difficulty concentrating, poor interest and motivation, poor energy level, and constant depression. (R. 281). Her treating physician, Mark D. Fossey, M.D., stated that Hopper remained "significantly disabled from bipolar depression and panic attacks." *Id.* Her medications were adjusted. *Id.*

On September 18, 2009, Hopper reported to Dr. Fossey that she continued to have sleep difficulties and she believed she was experiencing auditory hallucinations. (R. 279). Hopper did not think the auditory hallucinations were severe enough to require treatment. *Id.* She had fewer and less severe panic attacks. *Id.* She had periodic feelings of sadness that could last for one or two days and would then subside for approximately one week. *Id.* On October 1, 2009, Hopper reported that a new medication had made her dizzy or "woozy." (R. 277). She said that she was

---

[2] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. *See also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).

still unable to work because of depressed mood, inability to concentrate, low energy, lack of motivation, and anxiety. *Id.*

On October 16, 2009, Hopper reported that she had continued to have sedation and balance issues with her medications, and she had not been driving due to those issues. (R. 275). While she had no panic attacks after her October 1 visit, she reported that she became angry easily. *Id.* She reported suicidal thoughts. *Id.* Her medications were adjusted. (R. 276). On November 2, 2009, Hopper reported twitching legs and excessive sleep. (R. 273). On November 16, 2009, her sedation had lessened, but she still did not feel comfortable driving. (R. 271). While she denied suicidal thoughts, she frequently had thoughts that life was not worth living. *Id.* Her medications were adjusted. (R. 272).

Hopper saw Dr. Fossey at Laureate on December 8, 2009, and she reported a constant headache. (R. 269). Hopper was very anxious about returning to work. *Id.* Medications were controlling her panic attacks, and she believed that she could drive safely. *Id.* Dr. Fossey stated that Hopper could not cope with the extreme stress of working during the holidays, but that Hopper "should be able to return to work in early January 2010." (R. 270). Her medications were adjusted to address her headaches. *Id.* On January 14, 2010, Hopper reported to Dr. Fossey that she had been fired from her job and that she would be switching health care providers because she would be losing her insurance. (R. 266-68). She continued to experience headaches of varying intensity. (R. 266).

Hopper was seen at OCHC Community Clinic on April 22, 2010 for refill of prescription medications. (R. 335). Notes state that lithium and Wellbutrin were refilled, and paperwork was completed for Seroquel. *Id.* The notes also state that Hopper would need to become established

5

as a new patient with a local physician in order to obtain clonazepam. *Id.* The impression was bipolar depression, stable on current medications. *Id.*

On July 22, 2010 at OCHC Community Clinic, it was noted that Hopper was seeing the chaplain at the hospital for counseling. (R. 333). Hopper requested medications that were more affordable, and her medications were adjusted. *Id.* On August 5, 2010, Hopper said that she was having trouble sleeping, and impressions were bipolar disorder stable on current medications; insomnia; and body aches and pains. (R. 332). Hopper's Trazodone was increased. *Id.* On August 19, 2010, her insomnia had improved, and a note stated that Hopper denied further problems. (R. 331).

On September 23, 2010, Hopper returned to the OCHC Community Clinic, and she complained that the Trazodone was no longer working and she was getting less than four hours of sleep a night. (R. 330). She reported episodes of mania for one or two days with increased energy and rapid thoughts, followed by depression. *Id.* Impressions were bipolar disorder with inadequate control; and insomnia. *Id.* Her medications were adjusted. *Id.* She returned for medication refills on October 7, 2010. (R. 329).

On January 18, 2011, Hopper was seen for an initial psychiatric evaluation at Express Psych, L.L.C. (R. 321-22). Impressions on Axis I were bipolar II disorder; post-traumatic stress disorder ("PTSD"); and panic disorder with agoraphobia. (R. 322). On Axis II, the impression was borderline personality disorder with cutting. *Id.* Hopper was prescribed lithium, Zoloft, and Trazodone. *Id.* Hopper was seen for follow-up on March 3, 2011. (R. 320). With new medications on March 23, 2011, Hopper reported that her mental symptoms were improved. (R. 318). She was having trouble with joint pain in her hips, elbows, and shoulders, and her psychiatric medications were adjusted to address that. *Id.* On April 20, 2011, Hopper reported

that she felt good and that the joint pain had resolved. (R. 317). She continued to have sleep problems, and her medications were adjusted. *Id.* On May 18, 2011, Hopper reported that she was doing much better. (R. 316).

Hopper returned to Express Psych on August 17, 2011 reporting that she had been ill with pneumonia. (R. 363). Hopper had been off of her medications for three weeks and had then restarted them without consulting her physicians. *Id.* Her symptoms had not yet improved, but her medications were continued. *Id.* On September 28, 2011, Hopper complained of irritability and poor sleep. (R. 362). She thought that she might be about to enter a manic phase. *Id.* Her medications were adjusted. *Id.*

On October 13, 2011, Hopper presented to OCHC Community Clinic with back, hip, and knee pain after a recent fall. (R. 366). The impression was left knee sprain, and she was prescribed Voltaren. *Id.*

On October 26, 2011, Hopper returned to Express Psych and said that the increase in medication had stopped her irritability and that she was sleeping well. (R. 361). She was feeling tired, but she believed that would improve when she became used to the medication. *Id.*

On December 8, 2011, Hopper returned to OCHC Community Clinic with pain in her lower back and hip, stating that the Voltaren was not helping. (R. 367). The impression was chronic back pain, and she was prescribed Mobic and Flexeril. *Id.*

Agency consultant Beth Jeffries, Ph.D., completed a mental status examination of Hopper on March 13, 2010. (R. 290-93). Dr. Jeffries stated that Hopper appeared to be depressed and that her affect was slightly flat. (R. 291). Hopper's concentration, memory, judgment, and insight appeared to be intact. (R. 292). Dr. Jeffries' diagnostic impression on Axis I was major depression, recurrent, with psychotic features, moderate to severe. *Id.* In her concluding

paragraph, Dr. Jeffries said that she thought it was likely that Hopper's symptoms of depression were "impacting her ability to perform occupationally," and she noted Hopper's social withdrawal and isolation. *Id.*

Agency nonexamining consultant Ron Smallwood, Ph.D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment dated April 8, 2010. (R. 295-312). In the Psychiatric Review Technique form, for Listing 12.04, Dr. Smallwood noted Hopper's depressive syndrome. (R. 302). For the "Paragraph B Criteria,"[3] Dr. Smallwood indicated that Hopper had moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation. (R. 309). In the "Consultant's Notes" portion of the form, Dr. Smallwood noted Hopper's July 2009 inpatient treatment and summarized the psychiatric findings of the treating physicians. (R. 311). He noted her outpatient treatment at Laureate and her medications. *Id.* Dr. Smallwood also summarized Dr. Jeffries' report and Hopper's reported activities of daily living. *Id.*

In the Mental Residual Functional Capacity Assessment, Dr. Smallwood indicated that Hopper was markedly limited in her ability to understand, remember, and carry out detailed instructions and in her ability to interact appropriately with the general public. (R. 295-96). Hopper was not significantly limited in the other areas listed on the form. *Id.* In the narrative

---

[3] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

section, Dr. Smallwood wrote that Hopper could perform simple tasks with routine supervision and could relate to supervisors and peers on a superficial work basis. (R. 297). He found that Hopper could not relate to the general public, but could adapt to a work situation. *Id.*

Lisa M. Caldwell, Psy.D., completed a form entitled Mental Residual Functional Capacity Assessment on August 15, 2011. (R. 324-26). Dr. Caldwell indicated that Hopper had marked limitations in eight of twenty categories. (R. 324-25). She found Hopper moderately limited in nine additional categories, with no significant limitations in the remaining three categories. *Id.*

Dr. Caldwell wrote a letter dated January 19, 2012 on letterhead of Counseling Associates of the Four States, LLC, in Joplin, Missouri. (R. 369-70). She signed as a "provisionally licensed psychologist," and Kevin Whisman, Psy. D., co-signed the letter. (R. 370). Dr. Caldwell wrote that Hopper was currently her patient and that she did not want to submit progress notes "due to the confidential and extremely personal nature of what is disclosed therein." (R. 369). She said that her letter was intended to help in determining whether Hopper was eligible for disability benefits. *Id.*

Dr. Caldwell wrote that she had seen Hopper for individual psychotherapy sessions since fall 2010, for a total of 27 sessions. *Id.* Her Axis I diagnoses were bipolar II disorder, depressed, moderate; and generalized social phobia. *Id.* She scored Hopper's GAF as 51. *Id.* Dr. Caldwell said that Hopper's psychological problems, including disruptive depressive and hypomanic episodes, interfered in her day-to-day functioning. *Id.* She said that Hopper's recent symptoms included lethargy, lack of motivation, and difficulty with sleep and concentration. *Id.* She said that Hopper had difficulty leaving her house and adapting to new circumstances or environments. *Id.* Dr. Caldwell said it was highly unlikely that Hopper could manage the responsibilities of working full-time. (R. 370).

9

**Procedural History**

Hopper filed her application for disability insurance benefits on November 16, 2009, and she asserted onset of disability on July 8, 2009. (R. 157-60). The application was denied initially and on reconsideration. (R. 68-71, 76-78). An administrative hearing was held before ALJ Richard J. Kallsnick on December 19, 2011. (R. 28-59). By decision dated February 3, 2012, the ALJ found that Hopper was not disabled. (R. 9-23). On July 2, 2013, the Appeals Council denied review. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

**Social Security Law and Standard Of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009)

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

**Decision of the Administrative Law Judge**

In his decision, the ALJ found that Hopper met insured status requirements through December 31, 2014. (R. 11). At Step One, the ALJ found that Hopper had not engaged in any substantial gainful activity since her application date of July 8, 2009. *Id.* At Step Two, the ALJ found that Hopper had severe impairments of lumbar stenosis, status post back surgery; and depression/bipolar affective disorder. *Id.* At Step Three, the ALJ found that Hopper's impairments did not meet any Listing. (R. 11-14).

---

shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

The ALJ found that Hopper had the RFC to perform a range of work at the medium exertional level. (R. 14). For mental limitations, the ALJ found that Hopper could perform simple tasks with routine supervision and could relate to coworkers and supervisors on a superficial work basis. *Id.* Hopper could have minimal or no contact with the general public, and she was able to adapt to a work situation. *Id.* At Step Four, the ALJ determined that Hopper could return to past relevant work. (R. 21). As an alternative finding at Step Five, the ALJ found that there were a significant number of jobs in the national economy that Hopper could perform, taking into account her age, education, work experience, and RFC. (R. 21-23). Therefore, the ALJ found that Hopper was not disabled at any time since July 8, 2009. (R. 23).

**Review**

Hopper asserts two errors in the ALJ's decision. First, she argues that the jobs cited by the ALJ at Step Four did not qualify as past relevant work. Plaintiff's Opening Brief, Dkt. #16, pp. 6-7. Second, Hopper states that the ALJ's reasons for rejecting the opinion evidence of Dr. Caldwell, Hopper's treating psychologist, were not sufficient. *Id.* at 7-10. The Court agrees that the ALJ did not adequately justify his discounting of the opinion evidence of Dr. Caldwell. For this reason, the ALJ's decision is not supported by substantial evidence and does not comply with legal requirements, and the decision is therefore **REVERSED AND REMANDED**.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014). *See also* 20 C.F.R. §

404.1527(c)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.*

In the present case, the ALJ mentioned Dr. Caldwell's completed form and her January 19, 2012 letter and summarized them to some extent. (R. 17-19). The ALJ then wrote: "[E]ven in response to subpoena Dr. Caldwell provided no supporting documentation in the form of treatment notes or any objective findings to support the limitations in her medical source statement." (R. 19). The ALJ stated this objection slightly differently in the next paragraph of his decision: "Again due to the lack of any supporting documented treatment history and objective findings the undersigned accords Dr. Caldwell's medical opinion little weight." *Id.* The quoted language reflects that the ALJ's principal reason for giving Dr. Caldwell's opinions little weight was that she did not produce her treatment notes.

The Court finds that, in the circumstances of this case, the absence of treating notes is not a legally sufficient basis for discounting the opinion evidence of Dr. Caldwell. First, a requirement that treating notes are essential is in contrast to the applicable regulations that state only that treating physician opinions must be given controlling weight if they are supported by "medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(c)(2). While the Commissioner has vigorously defended the ALJ's decision here, she has not argued that there is an absolute requirement that treatment notes must be provided to support a treating psychologist opinion. Commissioner's Brief, Dkt. #17, pp. 5-10. The Court is not aware of any such requirement, and therefore finds that the ALJ's imposition of one was without legal basis.

13

Second, the Court finds that the ALJ did not properly consider whether the January 19, 2012 letter from Dr. Caldwell constituted the kind of supporting documentation called for by Section 404.1527(c)(2).  In *Robinson*, the claimant was seen by a psychiatrist who treated her on a monthly basis for more than three years before the administrative hearing.  *Robinson*, 366 F.3d at 1081.  The physician diagnosed the claimant with bipolar II disorder, the physician reported consistently that the claimant was unable to work as a result of her mental condition, and the claimant was hospitalized twice during his treatment.  *Id.*  The physician completed a functional assessment.  *Id.*  The ALJ rejected the functional limitations found by the psychiatrist.  *Id.* at 1081-82.  The Tenth Circuit was not sure if the ALJ had rejected the psychiatrist's opinions because they were not well-supported:

> If the ALJ meant that [the psychiatrist's] opinion about claimant's nonexertional mental limitations was somehow inadequately supported, we note that a psychological opinion may rest either on observed signs and symptoms or on psychological tests; thus, [the psychiatrist's] observations about claimant's limitations do constitute specific medical findings.

*Id.* at 1083 (citations omitted).  *See also Langley*, 373 F.3d at 1122.

While the physicians in both *Robinson* and *Langley* had provided their treatment notes, there is no indication in those decisions that the only way that a mental health practitioner can express "observed signs and symptoms" is through treatment notes.  In an unpublished case, the Tenth Circuit apparently viewed one "medical exam form" of a treating psychiatrist as potentially sufficient to support a mental medical source statement.  *King v. Barnhart*, 114 Fed. Appx. 968, 973-74 (10th Cir. 2004) (unpublished).  In the present case, the Court finds that Dr. Caldwell's January 19, 2012 letter is at least potentially sufficient to support her assessment form.

In the letter, Dr. Caldwell explained that she had seen Hopper for individual psychotherapy sessions on 27 different occasions over more than two years, and she included her

diagnoses. (R. 369-70). Dr. Caldwell said that Hopper's psychological problems, including disruptive depressive and hypomanic episodes, interfered in her day-to-day functioning. (R. 369). She noted Hopper's lethargy, lack of motivation, and difficulty with sleep and concentration. *Id.* Dr. Caldwell said that it was highly unlikely that Hopper could manage the responsibilities of working full-time. (R. 370). In the Court's view, Dr. Caldwell's letter contains her notes of observations that constitute specific medical findings, and those findings in turn could potentially be sufficient to support the limitations included in her assessment form completed in August 2011. Because the ALJ rejected Dr. Caldwell's assessment for the legally inadequate reason that she did not provide her treatment notes, he did not consider whether the January 2012 letter supported the assessment, and this case must be reversed to allow the ALJ to consider this important issue.

While the Court finds that the absence of treating notes was the ALJ's primary reason for rejecting Dr. Caldwell's August 2011 assessment, the ALJ also found that Dr. Caldwell's description of Hopper's anxiety in public was inconsistent with Hopper's own testimony. (R. 17, 19).

> The undersigned notes that the anxiety symptoms described by Dr. Caldwell are not fully consistent with the claimant's own testimony at the hearing. While Dr. Caldwell described the claimant as easily agitated in public with a desire to retreat, the claimant testified that she experiences anger and becomes almost violent in places like the store, where she runs over things with her cart.

(R. 17). The Court disagrees that there is an inconsistency between Dr. Caldwell's statement, accurately quoted by the ALJ above, and Hopper's testimony. In response to a question about her bipolar disorder, Hopper explained that she had depressive episodes and manic episodes. (R. 43). One of the things that she said about her manic episodes was that she had "a problem leaving my house. I don't handle people and stress well, or noise. I become almost violent." *Id.* Hopper's

15

attorney followed up with this exchange:

> Q. And you said you get almost violent, what do you mean by that? Can you give us an example?
>
> A. Yeah, like if I go to the grocery store and there's a lot of noise there, it's just like an instant hum that zooms in on me and I have in the past ran over people with shopping carts, because I needed to get out of the way.
>
> Q. And you hurt them?
>
> A. I run them over, I hit their carts, or hit them in the back when they're in front of me.
>
> Q. When was the last time this occurred?
>
> A. About two weeks ago.
>
> Q. Okay.
>
> ALJ. Is that like a road rage or something?
>
> A. Almost. It's - I just - I feel trapped and I need to get out of it, get away from the noise and the people.

(R. 44-45). The Court finds that Hopper's testimony establishes the two things that Dr. Caldwell said: That Hopper becomes agitated in public settings and that she desires to retreat. Thus, there is no substantial inconsistency between Dr. Caldwell's statements and Hopper's testimony, and the ALJ was not entitled to use the differences in their wording as a reason to reject Dr. Caldwell's opinion evidence. *See, e.g., Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1177 (10th Cir. 2014) (finding ALJ's reasons for discounting opinion of treating psychiatrist inadequate in part because ALJ's claimed inconsistencies were not substantial); *Langley*, 373 F.3d at 1121-23 (finding some of ALJ's reasons for discounting opinion evidence were "not supported by the record").

Further, the Court is concerned that the ALJ appeared to use very different standards in giving the report of the agency consulting examiner, Dr. Jeffries, great weight. The ALJ stated

that he did so because Dr. Jeffries "had the opportunity to examine the claimant and offered her opinion based upon the examination signs and findings." (R. 20). Dr. Jeffries examined Hopper only one time, while Dr. Caldwell had the advantage of having seen Hopper 27 times over more than two years. Dr. Jeffries' narrative report was three pages long, while Dr. Caldwell's was one and one-half pages, and Dr. Caldwell also completed a functional assessment form. (R. 290-92, 369-70). The ALJ's reasons for according Dr. Jeffries' report great weight while giving Dr. Caldwell's reports little weight are not sufficient to overcome the preference for treating physician opinions recognized by the regulations:

> The treating physician's opinion is given particular weight because of his "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalization." 20 C.F.R. § 416.927(d)(2). This requires a relationship of both duration and frequency. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records."

*Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (citation and emphasis omitted). *See also Jones v. Colvin*, 514 Fed. Appx. 813, 819 (10th Cir. 2013) (unpublished) (ALJ's reasons for rejecting opinion of a treating physician in favor of the opinion of a nonexamining physician were not legally sufficient); *Daniell v. Astrue*, 384 Fed. Appx. 798, 803 (10th Cir. 2010) (unpublished) (rejecting ALJ's criticism of format of treating physician report when nonexamining consultant report was in similar format). The Court finds that the assumption that a treating physician who has seen a claimant 27 times over more than two years has deeper insights into the limitations of a

claimant than a one-time examiner is especially applicable in the case of bipolar disorder,[5] a "mood disorder marked by alternating manic and depressive episodes." *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1081 n.2 (10th Cir. 1997) (citations omitted).

The parties devote large portions of their briefs to the question of whether Dr. Caldwell was entitled to withhold her treating notes. The question of whether Dr. Caldwell was justified in her refusal to produce her treating notes is not directly before this Court and was not before the ALJ in making a decision on Hopper's disability application. Instead, the question before the ALJ was proper consideration of Dr. Caldwell's opinion evidence, taking together the January 2012 letter and the August 2011 assessment. On remand, the ALJ must evaluate whether Dr. Caldwell's January 2012 contains observations that sufficiently support her August 2011 evaluation to give her opinions controlling weight. *Robinson*, 366 F.3d at 1083; *Langley*, 373 F.3d at 1122. The Court notes that, even if the ALJ continues to find that Dr. Caldwell's opinions are not entitled to controlling weight, Dr. Caldwell's opinions are still entitled to deference and the ALJ would need to consider the relevant factors of Section 404.1527(c)(2). *Krauser v. Astrue*, 638 F.3d 1324, 1331-32 (10th Cir. 2011); *Sissom v. Colvin*, 512 Fed. Appx. 762, 766-67 (10th Cir. 2013) (unpublished). Additionally, if the ALJ finds that the opinion evidence of Dr. Jeffries and Dr. Smallwood should be given more weight than the opinion evidence of Dr. Caldwell, he would need to provide adequate legal justification. *Robinson*, 366 F.3d at 1084 (error for ALJ to

---

[5] The Tenth Circuit has recognized, in other contexts, that one or two dates in a longitudinal history of mental illness may not fairly represent the varying severity of the illness. *See Hierstein v. Chater*, 110 F.3d 73 *2 (10th Cir. 1997) (unpublished) ("the ALJ's choice of two superficially favorable notations out of a five-year treatment record, downplaying the severity of a chronic mental impairment inherently varying with the vicissitudes of the patient's life, reflects the kind of misleading selective inquiry courts have decried on numerous occasions").

reject treating physician opinion in favor of nonexamining consultant opinion "absent a legally sufficient explanation for doing so").

**Conclusion**

The Court takes no position on the merits of Hopper's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Because this case is reversed based on the ALJ's failure to adequately justify his rejection or discounting of the opinion evidence of Dr. Caldwell, the undersigned declines to discuss Hopper's other asserted appeal issues. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Hopper.

Based on the foregoing, the decision of the Commissioner denying disability benefits to Claimant is **REVERSED AND REMANDED.**

Dated this 4th day of December 2014.

_____
Paul J. Cleary
United States Magistrate Judge